2013 UT App 153

# THE UTAH COURT OF APPEALS

BONNIE & HYDE, INC.,
Plaintiff and Appellee,
*v.*
TOM LYNCH,
Defendant and Appellant.

Opinion
No. 20120367-CA
Filed June 20, 2013

Second District, Ogden Department
The Honorable Scott M. Hadley
No. 080902079

Jennifer Neeley and Robert L. Neeley, Attorneys
for Appellant
Joseph E. Minnock and John T. Anderson,
Attorneys for Appellee

JUDGE CAROLYN B. MCHUGH authored this Opinion, in which
JUDGES JAMES Z. DAVIS and MICHELE M. CHRISTIANSEN
concurred.

McHUGH, Judge:

¶1     Tom Lynch (Tenant) appeals from the trial court's determination that he abandoned property that he had leased from Bonnie & Hyde, Inc. (BHI). Tenant also challenges the trial court's conclusions that BHI did not wrongfully convert or attach his personal property. We affirm, in part, and reverse and remand, in part.

BACKGROUND[1]

¶2    BHI, a company operated by Jeff Hyde, owns a building and real property in Huntsville, Utah. BHI leased the premises to a restaurant owner until 2005, when Tenant bought the prior owner's restaurant and assumed the lease. Tenant upgraded the restaurant by supplying his own personal property including new equipment and silverware. Thereafter, Tenant fell behind on his lease payments to BHI. In June 2007, BHI and Tenant executed a new lease agreement that lowered the amount of rent due on the first day of each month. If the rent was not paid by the fifth day of the month, the new lease imposed a late fee. Tenant was also responsible for paying the property taxes. In addition, Tenant agreed to keep the restaurant open every day from 10:00 a.m. to 8:00 p.m., except for certain holidays. Subsequently, the restaurant was rarely closed during these business hours. When Tenant was late on his rental payment, he typically contacted Hyde and they worked out a solution together.

¶3    In November 2007, Hyde sent Tenant an invoice for the 2007 property taxes, but Tenant did not pay the bill. Hyde called Tenant several times to discuss the matter, but Tenant did not return his calls. This behavior was unusual based on the prior conduct of the parties. Tenant also failed to pay the January 2008 rent by the first of the month. On January 6, 2008, BHI sent another 2007 property tax invoice to Tenant, and the following day, BHI sent a Three Day Notice to Pay or Vacate to the address specified in the lease as well as to the restaurant's address. Tenant denied receiving this notice. On January 9, 2008, Hyde called Tenant and left a message about the delinquent amounts. Tenant returned this call and indicated

---

1. "On appeal from a bench trial, we view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts consistent with that standard." *Alvey Dev. Corp. v. Mackelprang*, 2002 UT App 220, ¶ 2, 51 P.3d 45 (citation and internal quotation marks omitted).

that the check was in the mail.[2] Three days later, Hyde left a message for Tenant stating that he had not received the check.

¶4    Tenant was last on the premises on January 13, 2008, and two of Tenant's employees operated the restaurant the following day. Although the employees believed that they also tried to open the restaurant on January 15 or 16, 2008, their time sheets for another employer indicate that they were both working elsewhere at those times.

¶5    In the mid-afternoon of January 15, 2008, the power company disconnected the power to the restaurant for nonpayment. That afternoon, Hyde tried to reach Tenant on his mobile number and at the restaurant, but no one answered. That evening, Hyde went to the premises and discovered that the restaurant was closed and locked and that the parking lot and walks were covered with snow. When Hyde tried to enter the restaurant through the front door, he discovered that the locks had been changed. He found one door that still had a lock that could be opened with his key, but his access to that door was impeded by uncleared snow. Hyde entered the restaurant and became concerned that the lack of electricity might cause the water heater to freeze and burst. He found food that had not been properly stored, causing the restaurant to reek, and he noticed that equipment had been left in the "on" position, which he believed created a fire hazard in the event the power came on while no one was present. Upon inquiry, Hyde learned that the power could not be restored until the following day. He called Tenant twice that evening and left messages regarding the power outage, but Tenant did not respond.

¶6    Based on Tenant's failure to communicate with Hyde and the condition of the restaurant, Hyde believed that Tenant had abandoned the premises. Hyde then brought propane heaters to

_____

2. Tenant admitted at trial that he never sent the check.

the restaurant to prevent the pipes from bursting and made arrangements to have the locks to the building changed so that he could enter through the front door—access he needed to bring in the items required to mitigate the damage to the restaurant. Except for a few early morning hours, Hyde stayed at the premises until around four in the afternoon on January 16, 2008 without encountering Tenant or any of the restaurant's employees. When Hyde left, he posted a sign on the building that advised visitors to call BHI.

¶7     Tenant returned to the premises later that evening and discovered that he had been locked out of the restaurant. Nevertheless, Tenant did not contact BHI. Hyde returned the following day, and again no one came to open the restaurant. On January 18, 2008, Tenant left two messages for Hyde indicating that he was having a cash flow problem but that he hoped to obtain capital contributions from investors. When Tenant eventually spoke to Hyde that evening, he did not ask for a key or request to take possession of the premises or his personal property.

¶8     Three days later, Hyde and Tenant met at the restaurant. During this meeting, Tenant stated that he was "done with the business" and that he was struggling financially. According to Hyde, Tenant offered to sell the personal property to BHI and when Hyde declined, Tenant offered to leave his personal property in place to make the restaurant more appealing to a potential tenant. Tenant also indicated that he did not have the financial ability to move and store his larger items of personal property. Although Hyde helped Tenant move some of his smaller items of personal property at that time, Tenant did not request the rest of his personal property for over a year.

¶9     On January 22, 2008, Hyde posted a sign on the premises advertising that it was available for lease. Tenant assisted with cleaning the premises and with the search for a new tenant. As a

result of Tenant and Hyde's efforts, a potential tenant inspected the restaurant the following month.

¶10    In mid-March 2008, Tenant removed three patio sets, a grill, and several propane tanks from the restaurant. Believing these items to be BHI's property, Hyde alerted the police, who warned Tenant to stay away from the premises. Despite this admonishment, Tenant later saw people in the building and went inside to take pictures. He was subsequently prosecuted for trespassing.

¶11    In late March 2008, BHI filed a complaint for breach of contract and sought a lessor's lien and a writ of attachment on the personal property. Tenant counterclaimed for forcible detainer, forcible entry, willful exclusion, wrongful eviction, wrongful attachment, economic interference, conversion, deprivation of due process, and breach of contract. Subsequently, Tenant's counsel sent a letter to BHI's counsel requesting the release of personal property, claiming that there were defects in the attachment proceedings. In 2010, Tenant and his wife filed for bankruptcy and BHI's affirmative claims became part of that proceeding. As a result, when this matter was tried to the bench, only Tenant's counterclaims were at issue.

¶12    After trial, the court ruled in favor of BHI on all of the counterclaims. First, the trial court concluded that several of Tenant's claims failed because he had abandoned the property. Second, the trial court determined that Tenant could not recover on his personal property claims because he left the property at the restaurant by agreement and the personal property was later attached. Third, while noting that Tenant did not comply with rule 26(a)(1) of the Utah Rules of Civil Procedure requiring the disclosure of his damages evidence, the court determined that even if the evidence were considered, it did not show that Tenant had suffered damages. Tenant filed a timely appeal of the trial court's decision.

ISSUES AND STANDARDS OF REVIEW

¶13    Tenant first challenges the trial court's conclusion that he abandoned the leased premises. The Utah Code defines the circumstances under which abandonment will be presumed. *See* Utah Code Ann. § 78B-6-815 (LexisNexis 2012).[3] "We review the district court's application of the statute to the facts of the case for abuse of discretion." *Aris Vision Inst., Inc. v. Wasatch Prop. Mgmt., Inc.* (*Aris I*), 2005 UT App 326, ¶ 15, 121 P.3d 24, *aff'd*, 2006 UT 45, 143 P.3d 278. We will reverse a trial court's findings of fact only when such findings are clearly erroneous. *Dean v. Park*, 2012 UT App 349, ¶ 31, 293 P.3d 388. "Common-law abandonment depends on the intent of the party accused of the act." *Aris I*, 2005 UT App 326, ¶ 15. "The determination of intent is a question of fact, which will only be reversed if the district court's finding is clearly erroneous." *Id.*

¶14    Second, Tenant contends that the trial court should have determined that BHI was liable for forcible entry, unlawful detainer, and wrongful eviction. *See generally* Utah Code Ann. § 78B-6-801 (LexisNexis 2012). These issues present mixed questions of law and fact. *Aris I*, 2005 UT App 326, ¶ 16. "Matters of statutory construction are questions of law that are reviewed for correctness." *Id.* (citation and internal quotation marks omitted). "Questions of fact are reviewed under the clearly erroneous standard, with deference given to the trial court." *Id.* (citation and internal quotation marks omitted). "The trial court's application of law to the facts is reviewed for abuse of discretion." *Id.* (citation and internal quotation marks omitted).

¶15    Third, Tenant argues that the trial court erred in failing to determine that BHI wrongfully attached and converted his

---

3. Because the relevant statutes have not been substantively altered since this action was filed, we cite the current version of the Utah Code as a convenience to the reader.

personal property. The authority to grant a writ of attachment is governed by the Utah Rules of Civil Procedure. *See* Utah R. Civ. P. 64; *id*. R. 64A; *id*. R. 64C. "A district court's interpretation of a rule of civil procedure presents a question of law that is reviewed for correctness." *Aequitas Enters., LLC v. Interstate Inv. Grp., LLC*, 2011 UT 82, ¶ 7, 267 P.3d 923. Likewise, "[w]hether the facts establish the elements of conversion is a question of law, which we review for correctness." *Lawrence v. Intermountain, Inc.*, 2010 UT App 313, ¶ 10, 243 P.3d 508 (citations omitted).

¶16     Finally, Tenant asserts that the trial court erred by not awarding general, specific, treble, and punitive damages. "We review for an abuse of discretion the trial court's determination that [Tenant] failed to introduce sufficient evidence to establish damages, and we will not overturn the trial court's decision unless there was no reasonable basis for the decision." *See Richards v. Brown*, 2009 UT App 315, ¶ 12, 222 P.3d 69, *aff'd*, 2012 UT 14, 274 P.3d 911. Whether damages should be trebled under Utah Code section 78B-6-811 is an issue of statutory construction, which we review for correctness. *See Aris Vision Inst., Inc. v. Wasatch Prop. Mgmt., Inc.* (*Aris II*), 2006 UT 45, ¶ 7, 143 P.3d 278.

ANALYSIS

I. The Factual Findings Are Not Clearly Erroneous.

¶17     Tenant first challenges the trial court's factual findings supporting the conclusion that he had abandoned the premises. Accordingly, we must determine whether the findings were clearly erroneous. *See* Utah R. Civ. P. 52(a) ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."). A trial court's factual findings are clearly erroneous "only if they are in conflict with the clear weight of the evidence,

or if this court has a definite and firm conviction that a mistake has been made." *Gardner v. Gardner*, 2012 UT App 374, ¶ 16, 294 P.3d 600 (citation and internal quotation marks omitted). "Consequently, as an appellate court, we give great deference to the trial court and do[] not lightly disturb . . . [its] factual findings." *Henshaw v. Henshaw*, 2012 UT App 56, ¶ 10, 271 P.3d 837 (alterations and omission in original) (citation and internal quotation marks omitted).[4]

---

4. BHI contends that Tenant did not meet his marshaling obligation. *See* Utah R. App. P. 24(a)(9) (providing that when challenging a trial court's factual findings, the appellant "must first marshal all record evidence that supports the challenged finding[s]"). However, BHI's briefing of this point is deficient. As our supreme court recently noted, "Rule 24(b) makes the requirements of rule 24(a) applicable to the brief of the appellee." *Broderick v. Apartment Mgmt. Consultants, LLC*, 2012 UT 17, ¶ 10, 279 P.3d 391; *see also* Utah R. App. P. 24(b). Accordingly, BHI's argument must likewise "contain the contentions and reasons of [BHI] . . . with citations to the authorities, statutes, and parts of the record relied on." *See* Utah R. App. P. 24(a)(9). BHI's argument cites rule 24 and case law setting forth the appellant's duty to marshal, but it fails to point us to any specific material facts that Tenant did not set forth in his opening brief. This approach improperly dumps on this court the burden of comparing the record evidence to the facts marshaled by Tenant to determine whether anything of significance has been omitted. *See Allen v. Friel*, 2008 UT 56, ¶ 9, 194 P.3d 903 ("An appellate court is not a depository in which [a party] may dump the burden of argument and research. A petitioner must plead his claims with sufficient specificity for this court to make a ruling on the merits." (alteration in original) (citation and internal quotation marks omitted)). We exercise our discretion to consider Tenant's challenge to the factual findings. *See Martinez v. Media-Paymaster Plus/Church of Jesus Christ of Latter-day Saints*, 2007 UT 42, ¶ 20, 164 P.3d 384 (holding that the

(continued...)

¶18    Specifically, Tenant challenges findings of fact 19, 30, 33, 34, and 40. Finding 19 states,

> The court heard from [two of Tenant's employees] who testified they went to the restaurant on January 15th or 16th to open the business. Although the court does not believe these witnesses were lying, the court concludes they must be mistaken as to the day they went because time sheets from the Ogden Eccles Convention Center reflect that they were working there at the times they testified they tried to open the restaurant.

Although Tenant disagrees with this finding, there is evidence in the record to support it. BHI offered the time sheets from the Ogden Eccles Convention Center (the Center), which placed the two employees at that business at the times they testified they tried to open the restaurant. The Center's director of food and beverage explained that it would be very difficult to falsify the time sheets because the Center uses a code and hand swipe system. The trial court heard the conflicting testimony on this point and found the director's testimony more credible than that of the employees. We defer to the trial court's advantaged position to weigh that conflicting evidence. *See Hale v. Big H Constr., Inc.*, 2012 UT App 283, ¶ 60, 288 P.3d 1046 ("[W]hen, as here, there is conflicting evidence, we defer to the trial court as the factfinder. The existence of conflicting evidence does not give rise to clear error as long as evidence supports the trial court's decision." (citation and internal quotation marks omitted)).

---

4. (...continued)
reviewing court retains discretion to consider whether the record supports the factual findings despite a party's failure to marshal the evidence).

¶19   Tenant next challenges the trial court's assessment in Finding 30, that the conversation between Tenant and Hyde on the evening of January 18 was not "particularly meaningful other than that [Tenant] did not request a key or to take possession of the property. [Tenant] also mentioned that he had tried to find a buyer but that attempt fell through." In addition, he challenges Finding 34, which states that Tenant "did not ask to be allowed to resume possession." According to Tenant, these findings are inconsistent with Finding 29, which indicates that Tenant left a voicemail message for Hyde on January 18, explaining that Tenant's employees "went [to the restaurant] yesterday trying to get the place open, read the sign and came back down," that Tenant was "having a little cash flow problem," and that he has "a couple of people that [he] thought wanted to invest enough money . . . but it's kind of tough with the door locked." We see nothing inconsistent in the court's findings.

¶20   Finding 29 and Finding 30 address different communications on the same day. The trial court accurately relates the content of the voicemail message in Finding 29 and then accurately describes in Finding 30 the conversation between Hyde and Tenant when they communicated by telephone later that evening. The trial court's assessment that nothing meaningful was discussed is limited to the evening telephone conversation and correctly indicates that during that conversation, Tenant did not ask for a key or for possession of the premises. Tenant admits that fact in his reply brief to this court, stating, "[I]t is true that [Tenant] never specifically asked for a key for the new locks." Although Tenant further asserts that he "did in fact ask to re-take the premises," Tenant relies on his own testimony and his interpretation of the prior voicemail message. The trial court had the discretion not to believe Tenant. *See id.* ¶ 16 ("Assessing the credibility of a witness is within the trial court's domain."). Indeed, Tenant admitted at trial that he had lied to Hyde about putting a check in the mail and that he was "saying what he had to to try and stay alive." Furthermore, despite Tenant's reference to his hope

that he might secure additional capital and his statement that the locked door made it more difficult to find investors, the voicemail message does not include an express request for a key or possession of the premises.

¶21    Tenant also challenges Finding 33, which indicates that "no request was made to possess the remaining property for over one year." Tenant states, "It is undisputed [that he] offered to leave his property on the premises to help BHI find another tenant *after* BHI had locked [him] out of the restaurant and exercised dominion over [his] property." Notwithstanding that sequence of events, Finding 33 is not clearly erroneous. Once again, the recorded communications do not evidence a request for Tenant's personal property. In addition, Hyde testified that Tenant did not have the financial means to store the property he left in the restaurant and therefore he asked that it be left in place. According to Hyde, Tenant first requested the property be returned over a year later. The trial court is in the best position to assess the credibility of the witnesses and we decline to disturb its reliance on Hyde's testimony to support its finding on this point. *See id.*

¶22    Finally, Tenant challenges Finding 40, which states "In August 2009, [an appraiser], who testified at trial, valued the remaining property in BHI's possession at a little more than $1,500.00." Tenant contends that this finding is clearly erroneous because the appraiser testified as to the dealer value, rather than the full market value, of the property. Our review of the record indicates that the trial court's finding regarding the value of the equipment is supported by the evidence. The appraiser testified to two values for each of the items of personal property at issue. The first value represents the "average value of what [the appraiser would] buy [the] equipment for," and the second value is "what [the appraiser] would sell it for in a reconditioned state." He testified that after buying the items of equipment, he would "go through them at that point to refurbish them, clean them," and then resell them at the higher price. Thus, the appraiser estimated $1,520

as the price he would pay Tenant for the personal property. He then testified that after he had cleaned and refurbished the items, they could be sold for $9,300. Based on that testimony, the relevant price is the $1,520 that Tenant would have received for the property, not the amount the appraiser might have sold it for after he refurbished it. In fact, Tenant admits as much in his reply brief, stating, "[the appraiser] testified the $1520 value is the dealer's value he would pay to take the items, clean up, refurbish, then sell at a profit."

¶23    The trial court's findings are not against the clear weight of the evidence and are therefore not clearly erroneous. As a result, we consider Tenant's alternative challenge to the trial court's legal conclusion that he abandoned the leased premises in light of those findings.

## II. The Trial Court Did Not Exceed Its Discretion in Applying the Facts to the Statutory Presumption of Abandonment.

¶24    The Utah Code provides that abandonment is presumed if

> [t]he tenant has not notified the owner that he or she will be absent from the premises, and the tenant fails to pay rent within [fifteen] days after the due date, and there is no reasonable evidence other than the presence of the tenant's personal property that the tenant is occupying the premises.[5]

---

5. Abandonment is also statutorily presumed if

> [t]he tenant has not notified the owner that he or she will be absent from the premises, and the tenant fails to pay rent when due and the tenant's personal property has been removed from the dwelling unit and there is no reasonable evidence that the tenant is occupying the premises.

Utah Code Ann. § 78B-6-815(2) (LexisNexis 2012). Because this

(continued...)

Utah Code Ann. § 78B-6-815(1) (LexisNexis 2012). Accordingly, Tenant is presumed to have abandoned the premises if (a) he did not notify BHI that he would be absent from the premises, (b) he failed to pay rent within fifteen days, and (c) there is no reasonable evidence other than the presence of his personal property that Tenant is occupying the premises. *See id*. Where the statutory factors are established, the intent to abandon is presumed. *See id.* Here, the trial court determined that these factors were met.

¶25    There is evidence in the record to support each element necessary to create a statutory presumption of abandonment. First, Tenant did not notify BHI that he would be absent from the premises. Second, Tenant failed to pay rent within fifteen days; indeed, there is no evidence that he ever tendered a check for the January 2008 rent. Finally, by January 16, 2008, there was no reasonable evidence other than the presence of Tenant's personal property that he was occupying the premises. Instead, the restaurant was empty and closed during business hours, the power to the building had been turned off, the parking lot and walkways had not been cleared of snow, and food had been left out to spoil and foul the premises. Under these circumstances, we cannot conclude that the trial court exceeded its discretion in applying the law to the facts of this case. *See id.*

¶26    Nevertheless, Tenant claims that this court's decision in *Aris I*, 2005 UT App 326, 121 P.3d 24, *aff'd*, 2006 UT 45, 143 P.3d 278, supports his position that he did not abandon the premises. In *Aris I*, the tenant owned and operated a laser eye surgery center on leased premises, and contracted with doctors to perform surgeries there. *Id.* ¶ 2. Due to a downturn in business, the tenant failed to tender rent and notified third parties that it intended to terminate the business and to file for bankruptcy. *Id.* ¶¶ 3–4. During this time, the doctors continued to perform surgeries on the premises and the

---

5. (...continued)
subsection is not relevant under the present facts, we do not consider it further.

tenant began negotiating with them to assume the lease. *Id.* ¶ 3. Under those facts, the trial court determined that the statutory presumption of abandonment did not arise and that the landlord had not established abandonment by common law. *Id.* ¶¶ 13–14. On appeal, this court affirmed, explaining that the ongoing negotiations and operations provided "'reasonable evidence other than the presence of [the tenant's] personal property' that [the tenant] was still using the premises." *Id.* ¶ 19 (quoting Utah Code Ann. § 78-36-12.3(3) (2002) (current version at *id.* § 78B-6-815(1) (LexisNexis 2012))). We held in *Aris I* that the trial court did not exceed its discretion in ruling that there was no statutory presumption of abandonment. *Id.* We then concluded that the trial court's finding that the tenant did not intend to abandon the premises was not clearly erroneous and that, therefore, abandonment had not been proved under the common law. *Id.* ¶¶ 20–21.

¶27    Here, both the trial court's decision and the facts relevant to abandonment are different. First, the question in this appeal is whether the trial court exceeded its discretion in applying the statutory factors of abandonment to the facts of this case. In contrast, the *Aris I* court was faced with the question of whether the trial court exceeded its discretion in reaching the opposite conclusion. *See id.* ¶ 15 ("First, [the landlord] argue[s] that the district court erred in ruling that [the tenant] did not abandon the premises."). Next, the facts in *Aris I* established that the premises were in use by the doctors who continued to perform surgeries and that the tenant repeatedly tendered the past-due rent. *Id.* ¶¶ 5–7, 19. The evidence in this case established that the restaurant was closed and not in a condition to serve customers, and that Tenant had made no attempt to pay the past-due rent or to work with BHI, contrary to his usual practices. Despite Hyde's presence at the restaurant for most of two full business days, no one arrived to operate it. As a result, our decision in *Aris I* does not convince us that the trial court exceeded its discretion in determining that a statutory presumption of abandonment arose here.

¶28 Tenant further argues that abandonment can be found only in situations in which the tenant has an intent to abandon the premises. Intent is an element of common law abandonment. *Id.* ¶ 20 (defining common law abandonment as "when a tenant voluntarily relinquishes or vacates the leased premises with the intention to terminate contractual rights to . . . possession and control of the premises" and the "requisite intent can be shown by words or conduct" (omission in original) (citation and internal quotation marks omitted)). Because Tenant is presumed to have abandoned the premises under Utah law, his intent is relevant only to rebut that statutory presumption.[6]

¶29 Unlike the previous times when Tenant was late with his rent payment, he did not work with BHI to solve the issue. Moreover, Tenant did not pay the property tax bill even though he received the invoice two months earlier, and he did not communicate with BHI about the delinquency. Additionally, Tenant did not respond to Hyde's phone calls informing him of the power outage and the concerns about the water lines, and the restaurant was not open or ready for business during normal business hours. When Tenant and Hyde met on January 21, 2008, Tenant said he was "done with the business," and he actively participated in trying to find someone to take over the lease.[7] Based on this evidence, the trial court's finding that the presumption of

---

6. The common law requirements were relevant in *Aris I*, 2005 UT App 326, 121 P.3d 24, *aff'd*, 2006 UT 45, 143 P.3d 278, because, in the absence of a statutory presumption, the common law had not been displaced. *See id*. ¶ 20.

7. Although these events occurred after BHI had changed the locks, it has some relevance in establishing Tenant's state of mind at the relevant time. *Cf. American Fork City v. Rothe*, 2000 UT App 277, ¶ 7, 12 P.3d 108 ("[C]*onduct before and after* the offense are circumstances from which one's participation in the *criminal intent* may be inferred." (emphases added) (citation and internal quotation marks omitted)).

abandonment had not been rebutted by evidence of a contrary intent is not clearly erroneous. *See id.* ¶ 15 ("The determination of intent is a question of fact, which will only be reversed if the district court's finding is clearly erroneous."). Accordingly, the trial court did not exceed its discretion in concluding that Tenant had abandoned the premises.[8]

## III. BHI Converted Tenant's Property When It Refused to Return It After the Attachment Expired By Its Own Terms.

¶30    Tenant next argues that the trial court erred in ruling against him on his claims for wrongful conversion and attachment. "A conversion is an act of wilful interference with a chattel, done

---

8. Because we affirm the trial court's decision on abandonment, we also affirm its ruling in favor of BHI on forcible entry, unlawful detainer, and wrongful eviction. *See* Utah Code Ann. § 78B-6-814 (LexisNexis 2012) (providing that "an owner . . . shall not be prevented from . . . retaking the premises and attempting to rent them at a fair rental value when the tenant has abandoned the premises"); *id*. § 78B-6-809(1) (providing that a plaintiff asserting forcible entry or forcible detainer shall show that "he was peaceably in the actual possession at the time of the forcible entry, or was entitled to the possession at the time of the forcible detainer"); *see also Frisco Joes, Inc. v. Peay*, 558 P.2d 1327, 1329–30 (Utah 1977) ("A necessary predicate to the[] cause of action for forcible entry is that [the tenants] were in actual and peaceable possession of the property. [The tenants] could not be so if there had been abandonment or a surrender of the premises." (footnote citation omitted)); *Aris I*, 2005 UT App 326, ¶ 22 ("Both [the forcible entry and detainer] statutes and the tort action derived from them require that *unless a tenant plainly abandons the premises*, a landlord must resort to judicial process if he wishes to be rid of a tenant in peaceable possession." (alteration in original) (emphasis added) (citation and internal quotation marks omitted)). Accordingly, we affirm the trial court's decision not to award damages for those claims.

without lawful justification by which the person entitled thereto is deprived of its use and possession." *Fibro Trust, Inc. v. Brahman Fin., Inc.*, 1999 UT 13, ¶ 20, 974 P.2d 288 (citation and internal quotation marks omitted). A basic requirement of conversion is "[t]hat there be a wrongful exercise of control over personal property in violation of the rights of its owner." *Frisco Joes, Inc. v. Peay*, 558 P.2d 1327, 1330 (Utah 1977).

¶31     Here, the trial court found that "the property was originally left in the restaurant by agreement and then was attached." In particular, the trial court found that Tenant left the personal property on the premises because he could not afford to move it or to store it and because he hoped the property would assist in attracting a new tenant, thereby relieving him of his continuing obligations under the lease. The trial court also found that Tenant "was allowed to remove some personal property, in one instance with [Hyde's] assistance, and no request was made to possess the remaining equipment for over one year." It further determined that "[t]his showed that [Hyde] was not barring Tenant from removing the property." Accordingly, the trial court concluded that BHI did not wrongfully convert Tenant's personal property.

¶32     Tenant contends that these findings are not supported by the evidence. However, Hyde testified that Tenant "wanted to clean [the personal property] in order to stage the restaurant and get it rerented to mitigate his damages." Tenant corroborated that testimony, stating,

> I never told [Hyde he] could keep the property. I said if we had to rent the property, you know, it is in place. There's no way I'm moving it in January. [Hyde's] already stated there's a hundred feet of snow there. At that point without any money to store it, you know, it's one of those things where I didn't know where I stood legally. I owed him money.

While Tenant blames his decision on the weather and his economic circumstances, the fair inference from his testimony is that he agreed to leave the personal property in place and that he did not have the financial resources to store it elsewhere.

¶33 Nevertheless, Tenant argues in his reply brief before this court that he "offered to leave his property on the premises to help BHI find another tenant *after* BHI had locked [him] out of the restaurant and exercised dominion over [his] property." However, Hyde testified that he could open only a side door that was blocked by several feet of snow and that he changed the locks so that he could enter the building using the front door. Tenant admits that he had the locks changed sometime after he entered into the lease but claimed that he gave a key to Hyde. The trial court found Hyde more credible than Tenant, stating, "If [Hyde] hadn't changed the locks, he would be leaving [the restaurant] the way he found it with locks that he can't get in and out of." The trial court also found that Tenant never asked for a key to the new locks after Hyde changed them. Furthermore, BHI allowed Tenant to remove some of his personal property upon request, and Hyde helped Tenant remove it from the premises. Under these circumstances, the trial court's finding that Tenant agreed to leave his personal property on the premises is not precluded by the fact that BHI changed the locks. *Cf. English v. Standard Optical Co.*, 814 P.2d 613, 618 (Utah Ct. App. 1991) (upholding judgment in favor of the landlord for past-due rent even though the landlord changed the locks after the tenant failed to pay rent and damaged the premises); *see also* 49 Am. Jur. 2d *Landlord and Tenant* § 213 (2006) ("Where a tenant abandons the premises prior to the end of a lease term and the landlord changes the locks, this gives rise to the inference that the landlord accepted the surrender of the premises, although a mere surrender of the keys to the premises may not give rise to the inference of acceptance of surrender of the premises."). Accordingly, we reject Tenant's challenge to the trial court's factual findings regarding the initial agreement to leave the personal property on the premises.

¶34 With respect to wrongful attachment, Tenant argues that he was not given notice or an opportunity to be heard before the writ was granted. Tenant therefore contends that "the writ . . . expired because there was never a hearing" and that "[n]o one bothered to determine whether any of the property seized pursuant to the attachment included exempt property."[9] The trial court acknowledged that "both [Tenant] and the Court made mistakes in the attachment proceedings." However, the trial court overlooked these deficiencies on the ground that Tenant "should have asked for the writ to be set aside, which was not done until trial."[10]

¶35 The issuance of prejudgment writs of attachment is governed by rules 64, 64A, and 64C of the Utah Rules of Civil Procedure. *See* Utah R. Civ. P. 64; *id*. R. 64A; *id*. R. 64C. Although rule 64 provides that "[a]t any time before notice of sale of the property or before the property is delivered to the plaintiff, the defendant may file a motion to discharge the writ on the ground that the writ was wrongfully obtained," such a motion was not necessary here. *See id*. R. 64(f)(1). Rule 64A provides that

> [i]f a writ is issued without notice to the defendant and an opportunity to be heard, . . . the writ and the order authorizing the writ shall . . . expire [ten] days after issuance unless the court establishes an earlier expiration date, the defendant consents that the order and writ be extended or the court extends the order and writ after hearing.

---

9. Tenant claims that the personal property included Tenant's professional equipment and tools and that these items are exempt from attachment.

10. Although Tenant did not move to discharge the writ, he denied all the paragraphs in the complaint relating to the lessor's lien and the writ of attachment in his answer. In addition, Tenant raised wrongful attachment as a counterclaim in his verified counterclaim and in his first and second amended answer and counterclaim.

*Id*. R. 64A(i)(5). The writ of attachment here was issued on April 3, 2008, and it was never extended by the court after hearing or by Tenant's consent. As a result, it expired ten days after it was issued by the court. *Cf. Bank of Ephraim v. Davis*, 581 P.2d 1001, 1006 (Utah 1978) ("[F]ailure to file an inventory and return in compliance with mandatory statutory requirements renders the attachment proceeding void."); *Freeway Park Bldg., Inc. v. Western States Wholesale Supply*, 451 P.2d 778, 784 (Utah 1969) (determining that an affidavit filed by the landlord did not comply with statutory requirements and therefore the "trial court properly held that the attachment was void").

¶36     In February 2009, almost a year after the writ of attachment had expired by its terms, Tenant asked BHI to return his personal property. BHI refused to release the property, instructing Tenant to seek redress from the trial court. However, the plain language of rule 64A obviates any obligation for Tenant to challenge the writ, instead providing that it "shall . . . expire [in ten] days" unless extended by consent or an order of the court after hearing. *See* Utah R. Civ. P. 64A(i)(5). At the time of the February 2009 request for its return, BHI was holding Tenant's personal property only by agreement. Tenant withdrew his agreement in February 2009, yet BHI refused to return the personal property. We agree with Tenant that the failure to return the personal property was wrongful.[11]

---

11. We also agree with Tenant that BHI was not entitled to a landlord's lien. The Utah Code provides that "lessors shall have a lien for rent due upon all nonexempt property of the lessee brought or kept upon the leased premises so long as the lessee shall occupy said premises and for [thirty] days thereafter." Utah Code Ann. § 38-3-1 (LexisNexis 2010). Accordingly, the procedures to establish a lessor's lien "must be undertaken within thirty days of the time lessee vacates the premises." *Webb v. Ninow*, 883 P.2d 1365, 1368 n.1 (Utah Ct. App. 1994). Here, Tenant had abandoned the premises by January 16, 2008, but BHI did not file this action for breach of contract and lessor's lien until more than thirty days later in March

(continued...)

¶37    The trial court provisionally determined the value of the personal property at a little more than $1,500. However, it also found that BHI had filed a notice of claim in the bankruptcy proceeding "for more than $65,000.00." At trial, counsel stipulated that, in the event that Tenant prevailed on his counterclaims, the trial court could not offset any damages due to Tenant against the amount due to BHI because that issue should be left to the bankruptcy court. As a result, we remand to the trial court to enter judgment in favor of Tenant for the value of the personal property and stay enforcement thereof pending further proceedings in the bankruptcy court. *See generally* Ralph Brubaker, *Article III's Bleak House (Part II): The Constitutional Limits of Bankruptcy Judges' Core Jurisdiction*, 31 No. 9 Bankruptcy Law Letter 1 (Sept. 2011) ("If the district court concludes that [the landlord] does owe [the d]ebtor money, in view of [the landlord's] asserted right of setoff, the district court could obviously rule on that issue in order to determine the dollar amount of any judgment against [the landlord]. Alternatively, though, the district court might well remand the offset issue back to the bankruptcy judge . . . .").

CONCLUSION

¶38    Tenant has not shown that the findings of fact are clearly erroneous, and the trial court did not exceed its discretion in ruling that under the present facts, Tenant abandoned the premises.

---

11. (...continued)
2008. Therefore, BHI was not entitled to a landlord's lien on the personal property. *See Citizens Bank v. Elks Bldg., NV*, 663 P.2d 56, 58 (Utah 1983) ("[B]y the express terms of the statute, the lessor's statutory lien terminates thirty-one days after the lessee has quit the premises." (citing Utah Code Ann. § 38-3-1 (1974) (current version at *id*. (LexisNexis 2010)))); *Eason v. Wheelock*, 120 P.2d 319, 320 (Utah 1941) (holding that a landlord's lien was valid because it was exercised within thirty days and admonishing that "[a]ny act after that date would be one of withholding the property").

Accordingly, the trial court properly dismissed Tenant's claims for forcible entry, unlawful detainer, and wrongful eviction. The trial court erred in denying Tenant's wrongful conversion and attachment claims because the writ of attachment had expired by the time Tenant withdrew his consent to BHI's possession of the personal property. We therefore remand to the trial court for entry of judgment in favor of Tenant for the value of that personal property, which the trial court found was approximately $1,500, with the understanding that this amount will be offset against any amounts deemed owing to BHI in the bankruptcy proceedings.

————