21CA0662 Peo in Interest of CP 01-27-2022 COLORADO COURT OF APPEALS Court of Appeals No. 21CA0662 Delta County District Court No. 19JV34 Honorable Steven L. Schultz, Judge The People of the State of Colorado, Appellee, In the Interest of C.P., a Child, and Concerning T.P., Appellant. JUDGMENT AFFIRMED Division VII Opinion by JUDGE BERGER Brown and Johnson, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced January 27, 2022 John F. Baier, County Attorney, Adriana Hartley, Assistant County Attorney, Delta, Colorado, for Appellee Robert G. Tweedell, Guardian Ad Litem Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellant 
 1 ¶ 1 In this dependency and neglect proceeding, T.P. (mother) appeals the juvenile court’s judgment terminating her parent-child legal relationship with C.P. (the child). We affirm the judgment. Relevant Facts and Procedural History ¶ 2 The Delta County Department of Human Services filed a petition in dependency and neglect regarding fifteen-year-old L.Z., thirteen-year-old E.Z., and newborn C.P. The petition alleged that mother used methamphetamine and heroin during pregnancy and that both mother and the child tested positive for opiates at birth. The child was transferred to a different hospital’s neonatal intensive care unit to manage her withdrawal symptoms. ¶ 3 The juvenile court accepted mother’s admission to the petition and adjudicated the children dependent and neglected. The court adopted a treatment plan for mother requiring that she (1) participate in substance abuse and mental health evaluations and follow any recommendations; (2) submit random urinalysis tests (UAs) each week; (3) complete a parenting class; and (4) regularly visit the child. ¶ 4 The Department later moved to terminate mother’s parental rights to C.P. The court entered an allocation of parental 
 2 responsibilities (APR) for L.Z. and E.Z. with maternal grandmother, and they are not the subjects of this appeal. After a hearing, the court terminated mother’s parent-child legal relationship with C.P. The court also terminated the parental rights of C.P.’s father. He does not appeal. ICWA Compliance ¶ 5 Mother contends that the juvenile court failed to comply with the Indian Child Welfare Act of 1978 (ICWA). A. Additional Facts ¶ 6 Father appeared at only one court hearing during the entirety of the proceeding. During that hearing, the juvenile court recognized father from a different proceeding involving another child. Toward the end of the hearing the court addressed father as follows: [Father], remember the ICWA form and the relative placement affidavit that you filled out the last time? My recollection is you do not have any Native America [sic] heritage, right? I’m going to ask you to fill those forms out again and mail them back to the Court. All right? And then the Court will endeavor to disseminate copies at the next proceeding. 
 3 Father either made no response or did not respond verbally to the court’s questions. Father never again appeared in court and he did not return the ICWA form to the court. ¶ 7 At the termination hearing, the court inquired of all parties who were present, including the caseworker who had some ongoing but sporadic communication with father, whether they were aware of any Native American heritage for the child. No one presented any information to give reason to believe the child was an Indian child. B. Relevant Law ¶ 8 ICWA aims to protect and to preserve Indian tribes and their resources and to protect Indian children who are members or eligible for membership in an Indian tribe. 25 U.S.C. § 1901(2), (3). Indian tribes have an interest in Indian children that is distinct from, but equivalent to, parental interests. B.H. v. People in Interest of X.H., 138 P.3d 299, 303 (Colo. 2006); see also Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 52 (1989). Accordingly, in a proceeding in which ICWA may apply, tribes must have a meaningful opportunity to participate in determining whether a child is an Indian child and to be heard on the issue of ICWA’s applicability. B.H., 138 P.3d at 303. 
 4 ¶ 9 To ensure tribes have an opportunity to be heard, Colorado’s ICWA-implementing legislation provides that in dependency and neglect proceedings, the petitioning party must make continuing inquiries to determine whether the child is an Indian child. § 19-1-126(1)(a), C.R.S. 2021; see also B.H., 138 P.3d at 302. ¶ 10 In 2016, the Bureau of Indian Affairs also issued regulations and guidelines implementing ICWA. People in Interest of L.L., 2017 COA 38, ¶ 15; Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778 (June 14, 2016); Bureau of Indian Affairs, Guidelines for Implementing the Indian Child Welfare Act (Dec. 2016), https://perma.cc/3TCH-8HQM (2016 Guidelines); see also Notice of Guidelines, 81 Fed. Reg. 96,476 (Dec. 30, 2016). The 2016 Guidelines and regulations impose a duty of inquiry and notice on trial courts. ¶ 11 The trial court must ask each participant on the record at the beginning of every emergency, voluntary, or involuntary child custody proceeding whether the participant knows or has reason to know that the child is an Indian child. 25 C.F.R. § 23.107(a) (2020); see also L.L., ¶ 19. The inquiry must be made at the 
 5 commencement of the proceeding and all responses should be on the record. 25 C.F.R. § 23.107(a). ¶ 12 If the court knows or has reason to know or believe that an Indian child is involved in a child custody proceeding, including termination of parental rights, the party seeking termination must provide notice to any identified Indian tribes. 25 U.S.C. § 1912(a); § 19-1-126(1)(b). When doing so, the Department must directly notify the identified tribes of the child custody proceeding and their right to intervene by registered mail with return receipt requested. L.L., ¶¶ 24-25.  ¶ 13 Whether ICWA’s inquiry and notice requirements were satisfied is a question of law that we review de novo. People in Interest of T.M.W., 208 P.3d 272, 274 (Colo. App. 2009). C. Analysis ¶ 14 The juvenile court could (and should) have made a clearer record regarding father’s lack of Native American heritage by asking father to verbally respond to the court’s questions. ¶ 15 Nonetheless, an appellate court “may disregard any error or defect not affecting the substantial rights of the parties.” C.A.R. 35(c). As relevant here, defects in ICWA inquiry may be harmless if 
 6 no party has any information suggesting that a child is an Indian child. See People in Interest of S.R.M., 153 P.3d 438, 441-42 (Colo. App. 2006). ¶ 16 The context of the hearing at which father appeared makes clear that the court gave father the opportunity to provide additional information about any Native American heritage and that father had no such information. Additionally, neither mother nor any other party argues on appeal that father had Native American heritage. ¶ 17 Based on this record, any error in finding that the child was not an Indian child and that ICWA did not apply to the dependency and neglect proceeding was harmless. Statutory Criteria and Standard of Review ¶ 18 To terminate parental rights, clear and convincing evidence must establish that (1) the child has been adjudicated dependent or neglected; (2) the parent did not comply with or was not successfully rehabilitated by an appropriate, court-approved treatment plan; (3) the parent is unfit; and (4) the parent’s conduct or condition is unlikely to change within a reasonable time. 
 7 § 19-3-604(1)(c), C.R.S. 2021; People in Interest of C.H., 166 P.3d 288, 289 (Colo. App. 2007). ¶ 19 Where resolution of an issue necessitates application of the termination statute to evidentiary facts, it presents a mixed question of fact and law. People in Interest of A.M. v. T.M., 2021 CO 14, ¶ 15. We review the juvenile court’s factual findings for clear error. C.R.C.P. 52. The “credibility of witnesses, the sufficiency, probative effect and weight of the evidence, and the inferences and conclusions to be drawn therefrom are all within the province of the [juvenile] court.” People in Interest of C.A.K., 652 P.2d 603, 613 (Colo. 1982). But a determination of the proper legal standard to be applied in a case and the application of that standard to the particular facts of the case are questions of law that we review de novo. M.A.W. v. People in Interest of A.L.W., 2020 CO 11, ¶ 31. Reasonable Efforts ¶ 20 Mother argues that the juvenile court erred in finding that she was unfit because the Department did not make reasonable efforts to rehabilitate her. 
 8 A. Relevant Law ¶ 21 To determine whether a parent is unfit, the juvenile court must consider whether “[r]easonable efforts by child-caring agencies . . . have been unable to rehabilitate the parent.” § 19-3-604(2)(h); accord People in Interest of S.N-V., 300 P.3d 911, 915 (Colo. App. 2011). “‘Reasonable efforts’ . . . means the exercise of diligence and care” to reunify a parent with her child who is in out-of-home placement. § 19-1-103(114), C.R.S. 2021; see S.N-V., 300 P.3d at 915. ¶ 22 The Department satisfies the reasonable efforts standard by providing services in accordance with section 19-3-208, C.R.S. 2021. See People in Interest of J.A.S., 160 P.3d 257, 262 (Colo. App. 2007). Such reasonable efforts include screening, assessments, home-based family and crisis counseling, information and referral services to available public and private assistance resources, visitation services for parents with children in out-of-home placement, and placement services including foster care and emergency shelter. § 19-3-208(2)(b). Additional services should be made available if they are determined to be necessary and appropriate by the case plan and if adequate funding exists. 
 9 § 19-3-208(2)(d). Examples include providing transportation to required services when other transportation is not available, mental health services, and drug and alcohol treatment services. Id. ¶ 23 “The parent is responsible for assuring compliance with and success of the treatment plan.” People in Interest of A.N-B., 2019 COA 46, ¶ 28. B. Analysis ¶ 24 The record supports the juvenile court’s finding that the Department made reasonable efforts to rehabilitate mother. The caseworker testified that the Department made referrals for substance abuse counseling and drug testing, and provided a gas card for mother to go to UAs, appointments, and visits. The Department referred mother to a parenting class, and it set up visits with the child. It also arranged for visits to be supervised by a different provider after mother complained that the child was bruised, dirty, and injured and that the first visitation provider was not taking her concerns seriously. ¶ 25 Mother contends that only inpatient treatment was sufficient to address her addiction and that the Department failed to provide such services. She also contends that the juvenile court erred when 
 10 it attributed her failure to attend inpatient treatment to not signing releases or otherwise taking the steps necessary to be admitted. The juvenile court rejected these arguments, and so do we. ¶ 26 Mother’s therapist testified that she left a release of information at the front desk of the outpatient treatment facility, which mother signed. But both mother’s therapist and the caseworker testified that mother did not follow through with attending inpatient treatment. Mother does not explain what additional steps the Department failed to take. In fact, the record shows that mother stopped communicating with the Department approximately four months before the termination hearing. ¶ 27 For all these reasons, we conclude that the juvenile court did not err in finding that the Department made reasonable efforts to rehabilitate mother and reunify the family. ¶ 28 Nevertheless, mother argues that the juvenile court erred by finding that she was unfit as a matter of law under section 19-3-604(2)(k). She argues that section 19-3-604(2) does not require a juvenile court to find a parent unfit as a matter of law if the child has been in foster care for fifteen of the most recent twenty-two months. 
 11 ¶ 29 Section 19-3-604(2) provides that a juvenile court “shall consider” whether the child has been in foster care for fifteen of the most recent twenty-two months along with other relevant factors to determine whether a parent is unfit. The juvenile court found, with record support, that mother was unfit after considering that the child had been in foster care for fifteen of the most recent twenty-two months, in addition to other factors including her continuing use of controlled substances and neglect of the child. See § 19-3-604(2)(e), (f). Testimony at the termination hearing permitted the juvenile court to find that during the course of the proceeding mother provided only nine total UAs, most of which were positive for opiates, and that mother attended only about half of her scheduled visits with the child before ceasing visits entirely about four months before the termination hearing. ¶ 30 Mother also argues that whether the child had been in foster care for fifteen of the most recent twenty-two months is not a relevant consideration when the Department fails to make reasonable efforts to reunify the family. See § 19-3-604(2)(k)(III). We have concluded that the juvenile court did not err by finding 
 12 that the Department made reasonable efforts to rehabilitate mother and reunify the family. Accordingly, this argument fails. ¶ 31 Mother next argues that we should “take extra care before upholding decisions to terminate parental rights” in light of the COVID-19 pandemic. We acknowledge that the health and safety protocols instituted to slow the spread of COVID-19 affected many parents’ ability to visit their children in person and to engage in certain services. But mother presents no authority for this proposed heightened standard of review (whatever it might be). ¶ 32 The caseworker testified that mother, who was provided in-person visits throughout the proceeding, did not attend visits recently because mother said that “she had a warrant for her arrest and she was afraid that if she went to visits that she would get arrested.” Mother has not identified any record evidence suggesting that she was unable to participate in drug testing, treatment, parenting classes, or other services because of the pandemic. Unlikely to Change Within a Reasonable Time ¶ 33 The juvenile court found that mother’s conduct or condition was unlikely to change within a reasonable time. Mother contends 
 13 that the juvenile court erred by not allowing her additional time to complete her treatment. A. Relevant Law ¶ 34 When determining whether the conduct or condition that renders a parent unfit will change within a reasonable time, the court may consider whether any change has occurred during the pendency of the proceeding, as well as the parent’s social history and the chronic or long-term nature of the parent’s conduct or condition. People in Interest of K.B., 2016 COA 21, ¶ 31. ¶ 35 A reasonable time is not indefinite and must be determined by considering the child’s conditions and needs. People in Interest of A.J., 143 P.3d 1143, 1152 (Colo. App. 2006). The determination of a reasonable time is fact specific and varies from case to case. People in Interest of D.Y., 176 P.3d 874, 876 (Colo. App. 2007). ¶ 36 When, as here, a child is less than six years old when a petition in dependency and neglect is filed, the expedited permanency planning (EPP) provisions apply. See §§ 19-1-102(1.6), 19-1-123, C.R.S. 2021; People in Interest of M.T., 121 P.3d 309, 313 (Colo. App. 2005). These provisions require that the child be placed in a permanent home as expeditiously as possible. § 19-1-102(1.6). 
 14 B. Analysis ¶ 37 Nothing in the record suggests that mother would have become fit if given additional time. Instead, testimony at the termination hearing permitted the juvenile court to find that the proceeding had been open for seventeen months and that in that time mother (1) was discharged from integrated mental health and substance abuse treatment twice; (2) provided only nine total UAs, most of which were positive for opiates; (3) failed to complete the required parenting class; and (4) attended only about half of her scheduled visits with the child before ceasing visits entirely about four months before the termination hearing. ¶ 38 The caseworker also testified that she was familiar with mother based on a case several years ago, where mother successfully completed an adult treatment court program, but that during the present dependency and neglect proceeding mother had not indicated a willingness to engage with the treatment plan. Accordingly, the caseworker opined that mother would not become fit in a reasonable time. Based on this record evidence and the EPP guidelines, the juvenile court did not err by finding that mother’s 
 15 conduct or condition was unlikely to change within a reasonable time. ¶ 39 On appeal, mother does not suggest how much additional time she would need to become fit. And she does not dispute the juvenile court’s finding that she made no progress in the last months of the case, instead appearing to regress. Accordingly, the juvenile court did not err by not allowing mother additional time to complete her treatment. No Less Drastic Alternative ¶ 40 Lastly, mother argues that the juvenile court erred by finding that no less drastic alternative to termination existed. A. Relevant Law ¶ 41 The juvenile court must consider and eliminate less drastic alternatives before it terminates the parent-child legal relationship. C.S. v. People in Interest of I.S., 83 P.3d 627, 640-41 (Colo. 2004). When considering less drastic alternatives, the court bases its decision on the best interests of the child, giving primary consideration to the child’s physical, mental, and emotional conditions and needs. § 19-3-604(3). 
 16 ¶ 42 When determining whether placement with a relative or other person is a viable alternative to termination, the juvenile court may consider various factors, including whether an ongoing relationship with the parent would be beneficial or detrimental to the child. People in Interest of A.R., 2012 COA 195M, ¶ 38. This determination will be influenced by a parent’s fitness to care for her child’s needs. See § 19-3-604(2); A.R., ¶ 38. Long-term placement with a relative is not a viable less drastic alternative to termination if the child needs a stable, permanent home that can only be assured by adoption. People in Interest of M.B., 70 P.3d 618, 627 (Colo. App. 2003). B. Analysis ¶ 43 The record supports the juvenile court’s finding that no less drastic alternative to termination existed. The caseworker testified as an expert in child protection that termination and adoption were in the child’s best interests. The caseworker further testified that the child had been in the same foster home since her release from the hospital at birth and that the foster family wanted to adopt her. She testified that the Department investigated other placement options such as family friends and mother’s aunt but that none of 
 17 those individuals were appropriate for long-term placement. Maternal grandmother had placement of mother’s older children, but the caseworker testified that because of her age and medical limitations maternal grandmother was not physically able to care for C.P. ¶ 44 Mother suggests that the juvenile court should have ordered an APR with the foster family, but the caseworker testified that the foster family was unwilling to accept an APR, and no record evidence suggests that an APR with the foster family was an available option. ¶ 45 Based on this evidence in the record, the juvenile court did not err in finding that no less drastic alternative to termination existed. Disposition ¶ 46 The judgment is affirmed. JUDGE BROWN and JUDGE JOHNSON concur.